IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

TEAMSTERS HEALTH AND WELFARE
FUND OF PHILADELPHIA AND
VICINITY, et al.,

                Plaintiffs,

     v.

COURIER-POST COMPANY,

                Defendant.

Civil No.  15-844 (JS)

**MEMORANDUM OPINION WITH**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This Memorandum Opinion with findings of fact and conclusions of law serves as the Court's decision with regard to the non-jury trial of this matter held on December 14 and 15, 2015. Pursuant to 28 U.S.C. § 636(c), the parties consented to the jurisdiction of this Court to hear this matter. The Court has jurisdiction over this matter pursuant to 29 U.S.C. §§ 185(a), 1132 and 1145, and 28 U.S.C. § 1367. For the reasons to be discussed, the Court will enter Judgment in plaintiffs' favor in the amount of $6,891.72, plus appropriate liquidated damages, interest, attorney's fees and costs.

Background

Plaintiffs, Teamsters Health and Welfare Fund of Philadelphia and Vicinity ("H&W Fund"), Teamsters Pension Fund

1

of Philadelphia and Vicinity ("Pension Fund"), and Adam Garner, Administrator, filed this ERISA collection action on February 4, 2015. (The H&W Fund and Pension Fund will be collectively referred to as the "Funds.") In brief summary, the Funds are multi-employer Trust Funds that provide pension benefits and medical insurance, among other benefits, to eligible participants who work for contributing employers.[1] Plaintiffs seek to recover from defendant, Courier-Post Company ("C-P"), alleged delinquent payments due the Funds for the calendar years 2010-2011. Plaintiffs claim C-P owes $27,216.21 to the Pension Fund and $2,824.93 to the H&W Fund for a total delinquency of $30,041.14.

At all relevant times C-P was an employer and a party to three Collective Bargaining Agreements ("CBA's") with Teamsters Local Union No. 628. The three bargaining units were: (1) Drivers, (2) Circulation Representatives ("DSMs"), and (3) Single Copy Merchandisers ("SCMs"). Pursuant to the CBA's the C-P contracted to make payments to the Funds. The amount of the payments depended upon the language and dollar sums set forth in the CBA's. Since the CBA's were different for each of the three relevant bargaining units, a summary of the pertinent provisions for each unit is provided.

## Drivers

---

[1] The Trust Agreements were entered into evidence as Joint Exhibits ("J") 10, 11.

2

|  | Time Period | Trial Exhibit | Pension Payment Due | H&W Payment Due |
|---|---|---|---|---|
| 1. | 9/1/00–8/31/06 | Joint Exhibit ("J")-1 | For "all shifts worked by regulars and regular extras, as well as vacation and holiday shifts." | For "each shift worked." |
| 2A. | 11/9/06–3/11/11 | J-5 (a/k/a P-9A) | | For "each shift worked by regulars and regular extras." |
| 2B. | 11/9/06 – 3/11/11 | J-4 | For "each shift worked, as well as vacation shifts covered by this Agreement." | For "all drivers on the regular extra list…, the total number of shifts worked[.]" |
| 3. | 3/12/11–3/11/13 | J-6 | For "all shifts worked by regulars and regular extras, as well holiday shifts (not including personal holidays.)" | For "each shift worked by regulars and regular extras." |

Rows 2A and 2B above concern a fact dispute between the parties. Plaintiffs contend the signed November 9, 2006 extension for the Drivers (J-5) was in effect through March 11, 2011. C-P disagrees. C-P contends the terms of the Drivers' unexecuted November 9, 2006 Proposal (J-4) was in effect through March 11, 2011. As discussed infra, the Court finds that J-5, and not J-4, was in effect for the Drivers through March 11, 2011. Nevertheless, as will also be discussed, it makes no

3

difference to the result in the case whether plaintiffs or C-P
is right on this issue.

## Circulation Representatives ("DSM's")

|   | Time Period | Trial Exhibit | Pension Payment Due | H&W Payment Due |
|---|---|---|---|---|
| 1. | 9/1/00–8/31/06 | J-2 | For "all shifts worked, as well as vacation and holiday shifts." | For "all shifts worked, as well as vacation and holiday shifts." |
| 2. | 3/12/11–3/11/13 | J-7 | For "all shifts worked, as well holiday shifts (not including personal days.)" | For "each shift worked." |

## Single Copy Merchandisers ("SCM's")

|   | Time Period | Trial Exhibit | Pension Payment Due | H&W Payment Due |
|---|---|---|---|---|
| 1. | 9/1/00–8/31/06 | J-3 | For "each shift worked, as well as vacation and holiday shifts." | For "each shift worked covered by this agreement." |
| 2. | 3/12/11–3/11/13 | J-7 | For "all shifts worked, as well holiday shifts (not including personal days.)" | For "each shift worked." |

As is apparent, the CBA for the DSM's and SCM's merged (J-7) for
the March 12, 2011 – March 11, 2013 time period.

Although not the only issue in dispute, the primary focus
of the trial, and the major portion of plaintiffs' damage claim,
involves whether Pension Fund payments had to be paid for Local
628's "personal holidays." It was apparent from the testimony at
trial, and the Court so finds, that the parties equated

"personal holidays" and "personal days" in the sense that these were paid days off. In other words, a personal holiday or a personal day was a work day that someone could take off with pay for any reason.[2] (Personal holidays/personal days are different from vacation or sick days.) The resolution of whether Pension Fund payments had to be made for "personal holidays" is dependent on how the term "holiday shift" is interpreted. In addition to personal holidays/personal days and vacation days, Local 628 members were entitled to six (6) paid holidays.[3] The crux of the parties' dispute is whether C-P was required to make payments to the Funds for the workers' paid personal holidays/personal days. Plaintiffs say yes; C-P says no. C-P contends that although it agreed to make payments to the Pension Fund for the six paid holidays, it did not agree to make payments to the Pension Fund for paid personal holidays/personal days.

The Court's damage analysis is discussed <u>infra</u>. For present purposes the Court notes that the main issue just discussed only applies to Pension Fund payments for the years 2010 and 2011.[4] An

---

[2] Albeit, the CBA's required that notice be given for a requested personal day.  Pursuant to the CBA (J-1, Section VI) the Drivers were entitled to 5 or 6 personal holidays/personal days.

[3] These are New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving and Christmas.

[4] To be clear, as to the Drivers only J-1 and 5 are at issue. Since J-5 did not change the amount and terms of required payments to the Pension Fund, the controlling language for the Drivers carried over from J-1 until March 11, 2011. As to the

alleged deficiency exists for all three bargaining units but most of the delinquency involves the Drivers. The parties do not dispute that as of March 12, 2011, Pension Fund payments were not due for paid personal holidays/personal days. See J-6 and 7. Thus, the CBA interpretation issue to be addressed only involves payments due the Pension Fund for the time period of January 1, 2010 to March 11, 2011. The relevant language in J-1, 2 and 3 is essentially the same.

Plaintiffs presented three (3) witnesses at trial: (1) Adam Garner, (2) Fred Del Giorno and (3) Beth Raddi. C-P presented one witness—Thomas Hearon. Garner is employed by Administrative Personnel Services, Inc. ("ASP") and replaced William J. Einhorn on September 1, 2015 as the Administrator of the Funds.[5] Prior to this he worked as Assistant Administrator. Tr. 32:18-20. He started working for the Funds on April 30, 2012. Id. 54:21-23. Del Giorno is also employed by ASP but as a Senior Auditor. Like Garner and Del Giorno, Raddi is employed by ASP and is the Audit and Accounts Receivables Manager. She supervised Ed Stipa who did the audits at issue in the case. Hearon is currently the Regional Director and General Manager for Gannett Publishing

---

DSM's the controlling language is in J-2. As to the SCM's the controlling language is in J-3. Even though J-2 and J-3 originally expired on October 31, 2006, the parties do not dispute that the Pension Fund payment terms carried over to March 11, 2011.

[5] ASP provides administrative services to the Funds. Trial Transcript ("Tr.") 32:2-9.

Services. Tr. 240:22-25. He worked at the C-P's Cherry Hill facility from April 2007 to April 2013. Tr. 241:22 to 242:1. Prior to 2011 he was the General Manager and Operations Director at the Cherry Hill location. Tr. 241:18-21.

As noted, pursuant to the CBA C-P was required to make monthly contributions to the Funds. According to Garner, C-P's payments were made on the "honor system." Tr. 36:14-19. Nevertheless, the Funds conducted audits to verify that C-P made the correct monthly payment. Tr. 37:15 to 38:2. Sometime in 2014 Ed Stipa completed his audits of the Funds. After Stipa completed his audits Del Giorno did a "peer review" and determined that the audits were correct. Tr. 163:21-23. Stipa's audits were introduced into evidence as Joint Exhibits 9A (Drivers-2010), 9B (Drivers-2011), 9C (Circulation Managers-2010), 9D (Circulation Managers-2011) 9E (Single Copy Merchandisers-2010), and 9F (Single Copy Merchandisers-2011). Each of the audits contains a Difference Code Classification and Audit Code Classification. From these Codes one is able to determine how Stipa calculated the total amount owed to the Funds. The Codes also identify the particular employee involved in the alleged delinquency and the relevant time period.[6] The relevant Difference Code Classification at issue here is P ("Up through March 11, 2011, contributions are due the Pension Fund

---

[6] The Codes identify the who, when and why regarding Stipa's conclusion that C-P made overpayments and underpayments.

for paid personal holidays."). Plaintiffs contend wherever a P is listed in the last column of Stipa's audits C-P did not make a required Pension Fund payment for a personal holiday/personal day. The number of "P" days at issue for the years 2010 and 2011 is listed on the Difference Code Classification sheet. See generally Tr. 145:6 to 171:20.

On May 23, 2014, Stipa notified C-P of the alleged deficiency at issue. Stipa contended that $27,216.21 was due the Pension Fund and $2,824.93[7] was due the H&W Fund. (P-4).[8] After Stipa sent his May 23, 2014 notice the parties exchanged letters and emails regarding plaintiffs' audit. (P5 to 9; J-8). The sum and substance of these exchanges was that C-P disputed whether it was required to make payments to the Pension Fund for the members' paid personal holidays/personal days. The correspondence did not address any other substantive dispute.

Discussion

1.   Motion to Amend/Request to Strike Del Giorno

Prior to the presentation of plaintiffs' evidence C-P objected to the introduction of any evidence regarding plaintiffs' damage claim other than whether Fund payments had to

---

[7] Of the $2,824.93 allegedly due the H&W Fund, $2,262.08 was for medical bills the H&W Fund paid that should not have been paid but for C-P's errors.

[8] Stipa's audit revealed C-P made $2,745.89 in overpayments. However, the Funds did not give C-P a credit because C-P did not send a timely written credit request. P-4; see also Tr. 134:10 to 135:17.   C-P does not challenge this assertion and has not requested a credit for its overpayments.

be paid for the Drivers' personal holidays/personal days. C-P claimed this was the only claim made in plaintiffs' complaint. C-P also objected to testimony from Del Giorno who was only identified as a witness on the eve of trial. The Court overruled C-P's objections. The Court will expand on the reasons it gave for its ruling.

It is well-settled that requests to amend complaints are liberally granted unless there is undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party or futility of amendment. See generally Cincerella v. Egg Harbor Tp. Police Dept., C.A. No. 06-1183 (RBK), 2007 WL 2682965, at *2 (Sept. 6, 2007). It is also "well-settled that prejudice to the non-moving party is the touchstone for the denial of an amendment." Cornell & Co., Inc. v. Occupational Safety and Health Review Commission, 573 F.2d 820, 823 (3d Cir. 1978). Plaintiffs' oral motion to amend the complaint was granted because C-P was not prejudiced by plaintiffs' amendment seeking to recoup all their claimed damages. The reason is because C-P was on notice of plaintiffs' damage claim since the outset of the case. Plaintiffs seek the same damages they identified in their complaint. See Complaint ¶¶ 10, 13, 15, 19. Further, all of Stipa's audits were attached as exhibits to plaintiffs' complaint. See Complaint Exhibits 2,

7 [Doc. Nos. 1-5, 10]. And, plaintiffs produced Stipa's audits in discovery.

The Court is not persuaded by C-P's argument that it did not know until the day of trial that plaintiffs would be seeking damages beyond Drivers' Pension Fund payments for personal holidays/personal days. The reason is because plaintiffs produced their audit reports in discovery and these reports were introduced in evidence as Joint Exhibits. See J-9(A-F). Also, the audits were attached to plaintiffs' complaint. Plaintiffs are not seeking damages other than what is identified in the audit reports attached to their complaint, which they also produced in discovery. Thus, the Court finds that at all relevant times C-P was on notice of plaintiffs' damage claim and had an opportunity to conduct discovery to contest the claim. This being the case C-P was not prejudiced by plaintiffs' amendment.

It is true that plaintiffs' oral motion to amend was made late. However, the mere fact that plaintiffs' motion could have been made earlier is not determinative on whether the proposed amendment should be granted. See Adams v. Gould, Inc., 739 F.2d 858, 869 (3d Cir. 1984)(the mere passage of time, without more, does not require that a motion to amend a complaint be denied); Deakyne v. Commissioners of Lewes, 416 F.2d 290, 300 n. 19 (3d Cir. 1969)(delay alone is an insufficient ground to deny

10

an amendment). It is not unusual for pleadings to be amended long after a complaint is filed and even at the summary judgment stage of a case. <u>Adams</u>, 739 F.2d at 869. Indeed, amendments may be made during trial, after the close of testimony, or even after judgment. <u>See</u> Wright, Miller & Kane, <u>Federal Practice and Procedure: Civil 3d</u> §1494, pp. 56-57.

As to the request to strike Del Giorno, C-P's objection was also overruled. It is true that he was identified late. However, the substance of his testimony was not a surprise to C-P. Del Giorno merely "peer reviewed" Stipa's audits and his testimony was not materially different from what Garner offered. Moreover, C-P's counsel was prepared to cross-examine Del Giorno. Further, "[t]he Third Circuit has, on several occasions, manifested a distinct aversion to the exclusion of important testimony absent evidence of extreme neglect or bad faith on the part of the proponent of the testimony." <u>ABB Air Preheater, Inc. v. Regenerative Environmental Equipment Co., Inc.</u>, 167 F.R.D. 668, 671 (D.N.J. 1996)(citations omitted). This did not occur here.

> 2. <u>Which Driver Proposal was in Effect from 11/9/06 – 3/11/11?</u>

Although not determinative, the Court will briefly address whether J-5 or J-4 was in effect for the Drivers from November 9, 2006 to March 11, 2011. Not surprisingly, the Court holds that the signed copy of the Proposal (J-5) was in effect. This

Proposal was signed on November 9, 2006 by Mark J. Frisby, President and Publisher Courier-Post, and John P. Laigaie, President Teamsters Union Local No. 628. J-5 was admitted into evidence and there is no contention the signatures on the Proposal are not genuine or authentic. Notably, Hearon did not testify that J-5 was not the controlling contract. Nor could he justify why the Court should give effect to the unsigned Proposal (J-4) rather than the signed Proposal (J-5). Hearon simply testified he was given J-4 and that is what he used to govern the relationship with plaintiffs. Tr. 282:24 to 283:3. Although Hearon assumed J-4 was in effect, he did not challenge the validity of J-5. Although Hearon had a good faith belief that J-4 was in effect, this is not enough to discredit the validity of J-5. Nonetheless, this ruling is for naught. No matter which Proposal was in effect the Court would still rule in C-P's favor on the main issue to be addressed.

   3.   <u>Fund Payments for Personal Holidays/Personal Days</u>

   The Court will now focus on the crux of the case--how to interpret the parties' CBA's. As noted, although J-1, 2 and 3 are at issue, the relevant language in the CBA's is essentially the same. The relevant provision at issue states that payments are due to the Pension Fund for "all shifts worked by regulars and regular extras, as well as vacation and holiday shifts." The meaning of the term "holiday shifts" is what is in dispute.

Plaintiffs contend "holiday shifts" not only includes the six approved holidays but also paid personal holidays/personal days. C-P contends "holiday shifts" only means the six paid holidays.

The general principles of construction that apply to the parties' dispute are relatively straightforward. CBA's, including those establishing ERISA plans, are interpreted according to ordinary principles of contract law. M&G Polymers USA, LLC v. Tackett, ___ U.S. ___, 135 S.Ct. 926, 933 (2015). In this regard the Court must determine and implement the intention of the parties. Tessmar v. Grosner, 23 N.J. 193, 201 (1957). It is the objective, not subjective, intent of the parties that the Court must determine, as manifested in the language of their CBA's in light of the circumstances surrounding their execution. Dome Petroleum Ltd. V. Employers Liability Ins. Co. of Wisc., 767 F.2d 43, 47 (3d Cir. 1985).

The first step in the Court's analysis is to determine if the relevant CBA language is clear or ambiguous. Schor v. FMS Financial Corp., 357 N.J. Super. 185, 191 (App. Div. 2002). An ambiguity exists if the terms of a contract are susceptible to at least two reasonable alternative interpretations. Id. To determine if an ambiguity exists the Court must examine the CBA's as a whole. The Court should not torture the language in the CBA's to create an ambiguity where one does not exist. Id. Ultimately the Court's task is to ascertain the parties'

13

intention from the language in their CBA taken in its entirety, "the situation of the parties, the attendant circumstances, and the objects the parties were [attempting] to attain." Celanese Ltd. v. Essex County Improvement Authority, 404 N.J. Super. 514, 528 (App. Div. 2009).   The Court finds that the term "holiday shift" as used in Section XIV (J-1) is ambiguous. The term is not specifically defined in the CBA and plaintiffs and defendants offer reasonable alternative interpretations of the term.

The Court now has to interpret the term "holiday shift." Other than citing to the language and structure of the CBA's the parties did not submit any persuasive extrinsic evidence as to what was intended when the CBA's referenced the term "holiday shifts." No testimony was presented from anyone who participated in negotiating the relevant language. Nor did any party introduce any exhibits regarding the contemporaneous negotiations for the CBA's. Plaintiffs' position was based on what their auditor, peer reviewer and Administrator believed was the correct interpretation. None of these individuals were involved in the negotiations for J-1, 2 or 3. In fact, plaintiffs are not even parties to the CBA's. C-P's position was based on its General Manager's belief as to the correct interpretation. He also did not negotiate J-1, 2 or 3. Albeit,

14

Hearon was involved in negotiations for later versions of the CBA's.

Based on the evidence in the record, the Court rules in C-P's favor. What is most compelling is the fact that the parties separately used the terms "holidays" and "personal holidays/personal days" in the CBA. This evidences the parties knew the terms were different and were not interchangeable. The Court finds that if the parties intended for the C-P to make Pension Fund payments for "personal holidays/personal days," this could have and should have been specifically stated. Instead, the CBA only required Pension Fund payments for "holiday shifts." The Court does not interpret the term "holiday shifts" as used in the CBA's to include "personal holidays/personal days." Instead, the term only referred to paid holidays.

The Court will refer to J-1, the Drivers' CBA, for its illustrative analysis. Since J-5 made no change to the required Pension Fund payments set forth in the September 2, 2000 – August 31, 2006 CBA (J-1), the provision in Section XIV (a) of J-1 applied through March 11, 2011.[9] This provision, which dictated the Pension Fund payments that were due to the Drivers from July 1, 2010 to March 11, 2011, reads as follows:

---

[9] The parties agree that the interpretation the Court gives to "holiday shifts" in J-1 also applies to J-2 and J-3.

a) In addition to the wages paid under Section IV, the *Courier-Post* shall contribute monthly to the Teamsters Pension Trust Fund of Philadelphia and Vicinity, the sums set forth below for each shift worked covered by this Agreement.

1. As of September 1, 2000, the contribution by the *Courier-Post* will be $38.60 per shift or $193.00 per week.

* the above Pension payments will apply to all shifts worked by regulars and regular extras, as well as vacation and holiday shifts. (emphasis added).

** The Employer shall not be required to make Health & Welfare contributions or Pension contributions for those employees who upon retirement elect to receive their vacation and holiday pay in a lump sum.

b) In addition to the wages paid under Section IV, the *Courier-Post* shall contribute monthly to the Teamsters Health & Welfare Plan of Philadelphia and Vicinity, the sums set forth below for each shift worked covered by this Agreement.

When analyzing J-1 it is apparent that the parties used different terms to refer to the different kinds of days covered by the CBA. That is why in different portions of the CBA the parties used the following terms:

- vacation time
- holidays
- jury duty
- funeral leave
- personal days
- personal holidays
- vacation days
- vacation shift
- holiday shifts
- shifts worked.

16

Given the fair inference that the parties were experienced, knowledgeable and reasonably sophisticated negotiators, the Court assumes the parties knew what they intended. By using the term "holiday shifts" the parties only intended to refer to the six holidays named in Section VI (p. 18) of J-1. Just like Section XIV made it clear that Pension Fund payments would be made for paid vacation days the workers did not work, Section XIV also made it clear that Pension Fund payments would be made for paid holidays the workers did not work. If, as plaintiffs contend, the parties intended for Pension Fund payments to also be paid for personal holidays/personal days, the CBA would have read that Pension Fund payments would "apply to all shifts worked …, as well as vacation, holiday shifts, and personal days [or personal holidays]." As Hearon noted, there is a difference between a paid shift, a benefit shift and a credit shift. Tr. 285:14-24. Given the experience and likely sophistication of the personnel who negotiated the parties' CBA's, the Court finds that if the parties intended for personal holidays/personal days to be considered benefit days for the purpose of Pension Fund payments, this would have been explicitly stated. This was not done.  The Court finds this was not done because the parties did not intend for Pension Fund payments to be made for paid personal holidays/personal days.

17

The parties clearly distinguished the terms "holiday shifts" or "holidays," and "personal days" or "personal holidays." This is evidenced by the fact that the terms "holidays" and "personal days" or "personal holidays" were separately used in the CBA. Indeed, there is a separate denomination of "Personal Holidays" in the Holiday portion (J-1, Section VI, pp. 18-19) of the CBA. This shows that if the parties intended for Pension Fund payments to be paid for personal holidays or personal days, this would have been specifically stated. The parties' use of these specific terms in the CBA provides support for the holding that if the parties intended the term "holiday shift" to also include "personal holidays" or "personal days," this would have been specifically stated.

When interpreting Section XIV in the context of the language of the entire CBA there is nothing to indicate the parties intended the term "holiday shifts" in Section XIV to include personal holidays/personal days. A general principle of contract interpretation is that "identical words used in different parts of the same [contract] are intended to have the same meaning." Celanese Ltd., 404 N.J. Super. at 528 (citation omitted). The Court does not interpret the term "holiday shift" in Section XIV to include personnel holidays/personnel days, because when the CBA intended to refer to personal

18

holidays/personal days it specifically used these terms. Instead, the term "holiday shifts" just referred to one of the listed "holidays."

Plaintiffs' contrary arguments are not convincing. Plaintiffs alluded to the fact that when they previously audited C-P the same delinquency was listed and C-P acknowledged plaintiffs were right. However, there is no credible evidence in the record to support this contention. None of plaintiffs' witnesses had personal knowledge about an earlier audit and no exhibits were introduced into evidence regarding an earlier audit. In fact, the Court sustained C-P's objection to portions of the parties' exhibits and testimony that made fleeting references to an earlier audit. Tr. 111:9-23. Quite simply, any allusion to an earlier audit is a non-issue in the case.

Plaintiffs argue their interpretation is right because the CBA's effective on March 12, 2011 specifically excluded "personal holidays." See J-6, 7. This, plaintiffs argue, shows that personal holidays were previously included within the term "holiday shifts." Plaintiffs argue there was no reason to specifically exclude personal holidays starting March 12, 2011 unless personal holidays were included up to March 11, 2011. The Court disagrees. The Court does not accept plaintiffs' argument because plaintiffs did not present any evidence from someone involved in the negotiations for the March 12, 2011 to March 11,

19

2013 CBA's, e.g, J-6 and 7. The Court would be speculating as to C-P's intent if it accepted plaintiffs' argument. In fact, Hearon was involved in the negotiations for the new CBA in 2011 (Tr. 265:25 to 266:14) and he disputed plaintiffs' contention. Hearon testified it was always C-P's position that no Pension Fund payments were due for paid personal holidays/personal days. Id.; Tr. 270:13-18. The Court does not accept plaintiffs' argument because it is just as likely C-P wanted to document its consistent position as it is that C-P wanted to change what had been in existence.

The Court is also not persuaded by plaintiffs' argument that since the members' "Personal Holiday" benefits were included in Section VI dealing with "Holiday Pay," the parties intended that "personal holidays" and "holidays" be treated the same. If this were the case "holidays" and "personal days" would not have been separately listed in Section V-Vacations (pp.17-18). Contract provisions should be "read as a whole, without artificial emphasis on one section, with a consequent disregard for others." Borough of Princeton v. Bd. of Chosen Freeholders of Mercer, 333 N.J. Super. 310, 325 (App. Div. 2000), aff'd, 169 N.J. 135 (2001). Words and phrases should not be isolated but instead should relate to the context and contractual scheme as a whole and given the meaning that comports with their probable intent and purpose. Newark Publishers' Ass'n v. Newark

20

Typographical Union, No. 103, 22 N.J. 419, 426 (1956). The Court, of course, understands that a contract should be interpreted in a common sense manner. Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 103 (2009). There is nothing illogical about interpreting the CBA to provide that Pension Fund payments need to be made for paid holidays but not for paid personal holidays/personal days.[10]

4.   Damages

The Court now turns to damages.   To support their damage claim plaintiffs rely on the audits prepared by Ed Stipa. See J-9(A-F). These audits were admitted into evidence under the business records hearsay exception. Fed. R. Evid. 803(6).[11]

---

[10] To the extent plaintiffs argue the CBA's should be interpreted against C-P as the drafter of the CBA's, the argument is rejected. There is no evidence in the record regarding who drafted J-1, 2, and 3. Instead, a fair inference is that the parties mutually drafted the CBA's with the input of sophisticated legal and/or business personnel.

[11] This is not surprising since records of this type ordinarily qualify as business records. See United States v. Blackwell, 954 F. Supp. 944, 976 (D.N.J. 1997)(admitting financial audit where this type of record was created and maintained in the ordinary course of the preparer's business); United States v. Sololow, 91 F. 3d 398, 402-403 (3d Cir. 1996)(compilation and summary of over $7 million in unpaid insurance claims prepared by a third-party administrator admitted as a business record where the record was made and kept in the third-party administrator's regular course of business), cert. denied, 519 U.S. 1116 (199&); United States v. Frazier, 53 F.3d 1105, 1110 (10th Cir. 1995)(regulatory compliance audit prepared by an independent contractor admissible under Rule 803(6) where this type of audit "was made in the course of [the independent contractor's] regular business activity and … it was the regular practice of  [the independent contractor] to create such a report.

Further, not only were plaintiffs' audits admitted into evidence as Joint Exhibits, but plaintiffs' witnesses testified extensively about how the audits were carefully prepared and checked for accuracy. Tr. 79:3 to 84:7; 139:14 to 143:23.

C-P argues plaintiffs did not satisfy their burden of proving damages. It argues that even though Stipa's audits were admitted into evidence, Stipa should have appeared at trial to testify concerning how the audits were prepared. The Court disagrees. The business records rule permitting the admissibility of records relieves the offering party from producing the witness who prepared the records. United States v. Console, 13 F.3d 641, 656-57 (3d Cir. 1993). Further, by its terms Rule 803(6) permits foundation evidence for the admission of a business record to be provided by the custodian of the records or other "qualified witness." Since plaintiffs' audits are in evidence, C-P's arguments are directed to the weight the Court should give the audits rather than whether the audits are competent evidence. U.S. v. Onyenso, C.A. No. 12-602 (CCC), 2013 WL 5322686, at *3 (D.N.J. 2013); Muller-Paisner v. TIAA, 528 Fed. Appx. 37, 41 n.2 (2d Cir. 2013) (call summaries are admissible under Rule 803(6) despite the plaintiff's general argument that the circumstances of preparation indicate a lack of trustworthiness); United States v.Kaiser, 609 F.3d 556, 576 (2d Cir. 2010)(noting that once the requirements of a business

22

record are met, questions about trustworthiness go to the weight, not the admissibility of the evidence).

The Court finds that plaintiffs' audits are in order and trustworthy and will defer to their accuracy. No evidence has been presented to lead the Court to question the accuracy of plaintiffs' audits. C-P has not cited to any material mistakes in the audits. Nor has C-P offered alternative calculations. It is not insignificant that C-P had an adequate opportunity to challenge plaintiffs' audits and chose not to do so. The Court will not discredit plaintiffs' audits which have been admitted into evidence, along with supporting testimony, in the absence of a credible reason to believe they are inaccurate. No evidence has been introduced in this regard.

As noted, plaintiffs' claim C-P owes $27,216.21 to the Pension Fund and $2,824.93 to the H&W Fund for a total delinquency of $30,041.14. C-P argues plaintiffs are not entitled to any damages if they lose the "holiday shift" interpretation issue. C-P argues plaintiffs did not submit competent proof as to any other damages. The Court disagrees and finds that Stipa's audits (J-9(A-F)) satisfy plaintiffs' burden of proof. As discussed, Stipa did not have to testify at trial for the Court to credit his conclusions and findings and to award damages to plaintiffs.

Having decided that plaintiffs' can recover damages, the Court must determine how much to award. This is computed by subtracting the disallowed "holiday shift" claim from plaintiffs' total damage claim. Based on the evidence at trial, the Court computed the total amount of plaintiffs' Pension Fund "holiday shift" claim to be $23,149.42.[12] Since plaintiffs' total damage claim is $30,041.14, plaintiffs' total award excluding the "holiday shift" claim is $6,891.72 ($30,041.14 – $23,149.42). Of this amount $2,824.93 is for the medical bills plaintiffs paid.

In sum, therefore, Judgment in the amount of $6,891.72 will be entered in plaintiffs' favor, plus appropriate liquidated damages, interest, attorney's fees and costs.[13] This total includes $2,824.93 in medical bills plaintiffs paid.

Conclusion

Accordingly, for all the foregoing reasons, the Court finds that Judgment will be awarded in plaintiffs' favor in the total amount of $6,891.72, plus appropriate liquidated damages,

---

[12] The Driver's claim totals $16,892.82. (2010 (311 days x $44.69 = $13,898.59) plus 2011 (67 days x $44.69 = $2,994.23)). The Circulation claim totals $5,720.32 (2010 (99 days x $44.69 = $4,424.31) plus 2011 (29 days x $44.69 = $1,296.01). The SCM claims totals $536.28 (2010 (6 days X 44.69) plus 2011 (6 days x $44.69)).

[13] See 29 U.S.C. § 1132(g)(2).

interest, attorney's fees and costs.[14] Plaintiffs shall submit a timely form of Judgement in accordance with L. Civ. R. 58.1.

Plaintiffs' attorney's fee and cost claims shall be submitted in accordance with the applicable Federal and Local Rules of Civil Procedure.[15]

s/Joel Schneider
JOEL SCHNEIDER
United States Magistrate Judge

DATED: December 30, 2015

---

[14] The parties stipulated that only $4,066.79 is subject to liquidated damages ($6,891.72 - $2,824.93 (medical bills)).
[15] The parties are encouraged to meet and confer to see if they can agree on the total sum due without further litigation.

25